**Sally Marie McNEIL, Petitioner–Appellant,**

v.

**Raymond L. MIDDLETON; Bill Lockyer, Respondents–Appellees.**

No. 01–56565.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 2003.

Filed Sept. 22, 2003.

---

Peter B. Clarke, Escondido, CA; Charles R. Khoury, Jr., Wilton, NH, for the petitioner-appellant.

Warren P. Robinson, Deputy Attorney General, San Diego, CA, for the respondent-appellee.

Before BEEZER, FERNANDEZ, and PAEZ, Circuit Judges.

## OPINION

PAEZ, Circuit Judge:

Sally Marie McNeil ("McNeil") appeals the district court's denial of her federal habeas petition, challenging the constitutional validity of her state court conviction for second degree murder. We have jurisdiction under 28 U.S.C. § 2254, and we reverse the district court's judgment and remand with directions to grant the petition.

In 1996, a California jury convicted McNeil for the second degree murder of her husband, Ray McNeil ("Ray"). At trial, McNeil admitted that she shot and killed Ray, but testified that she acted in self-defense because at the time of the killing she feared that her life was in imminent danger. McNeil also testified that Ray physically and sexually abused her throughout their marriage. In support of her defense, McNeil presented an expert witness who testified that McNeil suffered from the effects of Battered Women's Syndrome ("BWS").[1] This evidence was presented to show that McNeil's perception of imminent danger at the time of the killing was reasonable, genuine, and actual.[2]

At the conclusion of the trial, the court instructed the jury on first degree murder, second degree murder, voluntary manslaughter, and self-defense. As part of these instructions the court, as required by California law, instructed the jury that self-defense requires an actual and reasonable belief in the necessity of defending against imminent peril or great bodily harm. Although the court allowed McNeil to present BWS evidence, it instructed the jury that it could not consider this evidence in determining the reasonableness of McNeil's belief in her need to resort to self-defense by fatally shooting Ray. As the State concedes, this limiting instruction was erroneous under California law.

As noted, the court also instructed the jury on voluntary manslaughter. Under California law, a person is not guilty of murder if the person kills another in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury. This aspect of voluntary manslaughter is commonly referred to as "imperfect self-defense" or "unreasonable self-defense." In defining imminent peril, the court instructed the jury that imminent peril is a peril that is apparent to a reasonable person. The State also concedes that this definition of imminent peril was incorrect under California law.

In her direct appeal, state habeas petition, and subsequent federal habeas petition, McNeil argued that by limiting the

---

1. We recognize, as the California Supreme Court did in *People v. Humphrey*, 13 Cal.4th 1073, 1083 n. 3, 56 Cal.Rptr.2d 142, 921 P.2d 1 (Cal.1996), that the use of the terminology "Battered Women's Syndrome" is not an accurate description of the psychological, physical, and emotional consequences of battery and abuse that the word was intended to capture. However, because we are presented in this case with a state court record and decision, we refer to the terminology the state court used when addressing McNeil's claims.

2. In 1991, the California legislature adopted section 1107 of the Evidence Code, codifying the admissibility of Battered Women's Syndrome evidence. The legislature defined BWS in part as "the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence." Evidence of Battered Women's Syndrome is now commonly accepted in state and federal courts. *See, e.g., Moran v. Ohio*, 469 U.S. 948, 950 n. 2, 105 S.Ct. 350, 83 L.Ed.2d 285 (1984) (describing Battered Women's Syndrome and its acceptance as a legal theory of self-defense testimony); *DePetris v. Kuykendall*, 239 F.3d 1057, 1060 (9th Cir.2001) (describing expert BWS testimony); *People v. Humphrey*, 13 Cal.4th at 1077–79, 56 Cal. Rptr.2d 142, 921 P.2d 1.

jury's consideration of BWS evidence the trial court prevented the jury from considering constitutionally relevant evidence that supported her claim of perfect self-defense. McNeil also argued that the erroneous inclusion of a reasonableness standard in the definition of imminent peril prevented the jury from considering any claim of imperfect self-defense (and therefore from reaching a verdict of voluntary manslaughter) in violation of her constitutional right to present a defense and her due process right to a fair trial. The state court of appeal affirmed, concluding that, although the two instructions were erroneous, they were harmless. The district court also rejected McNeil's constitutional claims, ruling that the state court's decision was not an unreasonable application of clearly established constitutional law as determined by the Supreme Court.

Because the erroneous imperfect self-defense instruction wholly deprived McNeil of that defense by requiring that her fear be reasonable, McNeil was denied due process. The erroneous instruction prevented the jury from considering McNeil's defense that she was guilty of nothing more than voluntary manslaughter, thus depriving McNeil of her constitutional right to present a defense. In light of the substantial evidence McNeil proffered in support of an imperfect self-defense claim, the state appellate court's conclusion that it "[was] not reasonably likely that the jury would have misunderstood the requirements of the imperfect self-defense component of voluntary manslaughter," *People v. McNeil,* No. DO26047, slip op. at 9 (Cal. Ct.App. June 18, 1998), we conclude that the state court of appeal's analysis "resulted in a decision that was contrary to [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,*

529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Finally, because we conclude that the erroneous instruction rose to the level of constitutional error that had a substantial and injurious effect on the jury's verdict, we reverse the district court's denial of habeas relief.

## I. FACTS AND PROCEDURAL HISTORY

### A. BACKGROUND

We take the following recitation of background facts from the California Court of Appeal's decision, *People v. McNeil,* slip op. at 2–5:

McNeil and Ray were both former [M]arines, bodybuilders and steroid users. Their relationship was replete with violent altercations. Evidence was introduced that McNeil had hit Ray and threw things at him, including dumbbells and a VCR that she threw out a second story window as Ray was walking below, and that Ray had hit, kicked and pushed McNeil leaving her with bruises and black eyes. Evidence was also introduced that McNeil had several violent altercations with others, including women she suspected Ray was having affairs with, barroom bouncers, and the police.

On the night of the shooting, Ray said he was going out to the Price Club, which closed at 8:30 p.m., to get chicken for dinner. However, he did not return until 10:30 p.m., and had gone to a more expensive market. Ray had had several affairs during the course of the marriage, and McNeil suspected he had been seeing a girlfriend. McNeil criticized Ray for getting the more expensive chicken, which she could not afford, and asked what had taken him so long and if he had been with his girlfriend. She also told him he looked like "shit" and would not do well in an upcoming bodybuilding contest.

McNeil told police that Ray then slapped her, pushed her down on the floor and started choking her. McNeil squirmed away, ran into the bedroom and took her shotgun out of its case in the closet. She grabbed two shells, loaded one, pumped the gun, and then "went out and aimed it at [Ray]" and shot him. At the time, Ray was at the kitchen stove cooking chicken. McNeil stated that after Ray was shot, he doubled over and then came towards her, so she loaded the second round, pumped the gun again, and shot him a second time.

After that, McNeil gave the shotgun to a neighbor, and called 911. The 911 operator who took the call testified that she heard a male, who had been moaning, ask: "Why did you shoot me?" and McNeil respond: "I told you that I wasn't taking your shit anymore."

When police arrived, Ray was on his hands and knees about five feet inside the apartment and McNeil was standing at the kitchen sink. It looked like Ray's face had been blown off from the bridge of his nose down, and he was saying "Why?[,]" "Oh God," and "Help me." When paramedics arrived, Ray pointed to his stomach, and they saw his liver protruding through the skin. Ray was taken to the hospital and died that night. The shotgun wound to his midsection was the one that caused his death; the shotgun blast to his face caused massive damage to his lower jaw and face.

A police criminologist testified that the weapon used was a 12–gauge pump shotgun with a pistol grip, which was fired at Ray's midsection and then at his face from about six feet away. A crime scene reconstructionist opined that Ray's head was close to, and in line with, the sofa cushions when he was shot in the face, which would indicate that Ray was not upright when he was shot a second time.

Police discovered fingernail marks on McNeil's neck the night of the shooting and Ray's body was exhumed so that his fingernails could be examined. His fingernails were very short, and it was determined that his hands could not have caused the marks on McNeil's neck and further, that the marks were inconsistent with manual strangulation and could have been self-inflicted.

## B. McNeil's Defense

At trial, the State argued that McNeil committed murder when she killed Ray. McNeil's defense was that she killed Ray because she feared for her life. She presented this defense through the testimony of an expert on BWS and through her own testimony regarding her history of abuse at the hands of Ray.

The defense expert testified that McNeil "would definitely qualify to be a battered woman"; indeed, the State's expert agreed that McNeil was a battered woman, but that because she was assertive and aggressive, she was "not the typical person. with battered women's syndrome." However, McNeil's expert testified that in her experience battered women often develop assaultive behaviors as defense mechanisms.

The defense expert defined BWS for the jury and explained how BWS can make women hyper-sensitive to perceived threats of danger. The defense expert, who had conducted several clinical interviews with McNeil, testified that McNeil described regular beatings during her childhood and through her first marriage, including physical battery as well as death threats. McNeil provided detailed testimony of the physical harm that she suffered at the hands of Ray, which resulted in numerous injuries including five broken bones over the course of their marriage.

The expert testified that McNeil described several choking incidents as well as psychological abuse by Ray. The expert testimony on BWS also lent support to McNeil's testimony that she shot Ray out of a genuine perception of imminent danger, explaining the cycle of episodic violence and dispelling myths about why battered women like McNeil don't leave their abusers.

McNeil argued that this evidence established that she acted in self-defense and that the state failed to meet its burden of demonstrating that she did not act out of a genuine and reasonable fear of imminent harm. As the jury was instructed, "The burden is on the prosecution to prove beyond a reasonable doubt that the homicide was unlawful, that is, not justifiable, or not committed in self-defense." Perfect self-defense requires a reasonable belief in the necessity to defend against imminent peril to life or great bodily injury. *See* Cal.Penal Code § 197. As noted, McNeil also asserted that in the alternative, the evidence supported a claim of imperfect self-defense.[3] Imperfect self-defense is not a complete defense to homicide under California law; however, if the slayer can show that she had an actual, honest belief that she was in imminent danger even if such a belief was unreasonable, this showing negates the malice required for a murder conviction and reduces the crime to manslaughter. *See In re Christian S.,* 7 Cal.4th 768, 771, 30 Cal.Rptr.2d 33, 872 P.2d 574 (Cal.1994). For both perfect and imperfect self-defenses, in order to demonstrate an actual belief, McNeil had to show that her actions "were motivated by an

actual (also referred to as 'genuine' or 'honest') belief or perception that (a) the defendant was in imminent danger of death or great bodily injury from an unlawful attack or threat by the victim and (b) the defendant's acts were necessary to prevent the injury." *People v. Aris,* 215 Cal.App.3d 1178, 1186, 264 Cal.Rptr. 167 (Cal.Ct.App.1989), *overruled in part by Humphrey,* 13 Cal.4th at 1086, 56 Cal. Rptr.2d 142, 921 P.2d 1.

Prior to trial, the State filed a motion to preclude the jury from considering McNeil's BWS evidence in determining whether McNeil had a reasonable belief in the need for self-defense. Although McNeil argued that the expert's testimony would explain how the effects of BWS can fundamentally alter how a reasonable person perceives imminent harm, the trial court granted the motion. Thus, as a result of the court's pretrial ruling, the court allowed McNeil to present evidence that she suffered from BWS, but the jury was instructed that it could not consider BWS when evaluating the reasonableness of her actions in its evaluation of McNeil's perfect self-defense defense. This limitation on the use of BWS evidence was correct under then-existing California law. However, after McNeil's conviction, the California Supreme Court held that evidence of Battered Women's Syndrome is relevant to the reasonableness as well as the existence of a defendant's actual belief in the need to act in self-defense. *See People v. Humphrey,* 13 Cal.4th at 1088–89, 56 Cal. Rptr.2d 142, 921 P.2d 1. In light of the *Humphrey* decision, the State has ac-

---

**3.** The California Supreme Court has explained imperfect self-defense as follows:

Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably, believed he was in imminent danger of death

or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.

*In re Christian S.,* 7 Cal.4th 768, 771, 30 Cal.Rptr.2d 33, 872 P.2d 574 (Cal.1994).

knowledged that the limiting instruction was erroneous.

In its instructions on imperfect self-defense, the trial court erroneously instructed the jury that McNeil's perception of imminent peril to her life was to be assessed from the perspective of a reasonable person. By imposing a reasonableness requirement the trial court erred, as conceded by the State and recognized by the state appellate court, *see People v. McNeil*, slip op. at 9. Indeed, the insertion of the reasonableness standard essentially made the imperfect self-defense instruction the equivalent of the perfect self-defense instruction.

## C. The Verdict, Direct Appeal, and Habeas Proceedings

The jury ultimately convicted McNeil of second degree murder with the personal use of a firearm; the court sentenced her to 15 years to life in prison, plus a consecutive 4–year term for the firearm enhancement. *People v. McNeil*, slip op. at 1. McNeil appealed on a number of grounds, including that the erroneous limiting instruction prevented the jury from considering constitutionally relevant evidence in support of her perfect-self defense claim and that the erroneous instruction on imminent peril prevented her from presenting a meaningful imperfect-self defense claim. The California Court of Appeal did not address the merits of these claims; rather, it concluded that any error was harmless. The court affirmed the judgment on direct appeal and denied a companion petition for a writ of habeas corpus. The California Supreme Court subsequently denied a petition for review, and McNeil filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the district court. The district court dismissed the petition, and subsequently denied a certificate of appealability (COA). We granted a COA on the following two issues:

> (1) whether appellant's federal constitutional rights were violated when the trial court incorrectly instructed the jury that evidence of Battered Woman Syndrome could not be considered for the reasonableness of appellant's belief in her need for self-defense; and (2) whether appellant's federal constitutional rights were violated when the trial court incorrectly instructed the jury on "imminent peril."

## II. Standard of Review

We review de novo a district court's denial of a petition for a writ of habeas corpus. *Avila v. Galaza*, 297 F.3d 911, 914 n. 1 (9th Cir.2002). Because McNeil filed her habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996), applies. Habeas relief may be granted if a state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). When applying AEDPA and reviewing whether a state court decision is contrary to federal law, "we look to the state's last reasoned decision—in this case [the California Court of Appeal's decision]—as the basis for its judgment." *Avila*, 297 F.3d at 918. A state court decision is "contrary to" federal law if it fails to apply the correct controlling Supreme Court authority or comes to a different conclusion when presented with a case involving materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Furthermore, we must heed the Supreme Court's admonition that "[u]nder § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ

simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer v. Andrade,* 538 U.S. 63, ——, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003) (quoting *Williams v. Taylor,* 529 U.S. at 411, 120 S.Ct. 1495). Our review is significantly circumscribed: "AEDPA limits our review to the state court's *decision,* which is ordinarily entitled to deference." *Greene v. Lambert,* 288 F.3d 1081, 1088 (9th Cir.2002).

■ When asserting a claim of instructional error, the Supreme Court has held that a petitioner must show that the instructional error "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (internal citations omitted). The Supreme Court has long held that when analyzing instructional error and its effect on the validity of a conviction, "we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). We must also apply the Supreme Court's prejudice standard for evaluating trial error on collateral review as set forth in *Brecht v. Abrahamson,* 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See Bains v. Cambra,* 204 F.3d 964, 977 (9th Cir.2000). In *Brecht,* the Supreme Court held that a federal court may not grant habeas relief for trial errors without a showing of actual prejudice; error requires reversal only if it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

### III. VIOLATION OF MCNEIL'S CONSTITUTIONAL RIGHTS

■ We conclude that when considered in the context of the overall charge to the jury, the erroneous instruction on imperfect self-defense deprived McNeil of her constitutional right to an instruction on one of her two defense theories, thereby violating her right to present a defense and her right to a fair trial. Because we conclude that the erroneous imperfect self-defense instruction violated McNeil's constitutional right to present a defense and had a substantial and injurious affect on the jury's verdict, we limit our analysis to the imperfect self-defense instruction and do not reach the other instructional error.

The State, citing *Estelle,* 502 U.S. at 72, 112 S.Ct. 475, argues that the instructional errors at stake here were merely violations of state law that do not rise to the level of a federal constitutional violation. Although the State is correct that a state law violation alone does not warrant federal habeas relief, here, the state law violation implicated federal due process protections because the error so infected and permeated the trial that McNeil was prevented from presenting a defense. The erroneous instruction prevented the jury from considering McNeil's imperfect self-defense, thereby depriving McNeil of her Fifth Amendment due process right to a fair trial and her Sixth Amendment right to present a defense. *See Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' ")). Thus, the state court of appeal's adjudication of McNeil's constitutional claims was contrary to clearly established Supreme Court law.

Further, although the state court recognized the Supreme Court's admonition that when reviewing for instructional error, the charge to the jury must be considered as a whole, the state court unreasonably applied this principle by presuming that the jury simply ignored some instructions and followed others. Indeed, the court's interpretation was contrary to the clearly established Supreme Court law under which we presume that jurors follow the trial court's instructions. Although McNeil argued that the jury was prevented from considering her imperfect self defense claim, without even considering the evidence that was effectively excluded or evaluating the strength of her imperfect self-defense claim, the state appellate court concluded that the error was harmless because the jury found McNeil guilty of second degree murder. Because the state appellate court concluded that the trial court's instructional error was harmless, it failed to reach the merits of McNeil's due process constitutional claims that the instructional errors precluded her from presenting a meaningful defense and denied her a fair trial.

In light of the nature of the evidence, McNeil's defense, and the way in which the instructional error eliminated imperfect self-defense from the jury's consideration, we hold that the erroneous imperfect self-defense instruction so infected the trial as to violate McNeil's right to due process.

## A. THE ERRONEOUS INSTRUCTION ON IMPERFECT SELF-DEFENSE

The erroneous imperfect self-defense instruction read as follows:

A person, who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but is not guilty of murder. This would be so even though a reasonable person in the same situation, seeing and knowing the same facts, would not have had the same belief. Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.

An "imminent peril" is one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer as a reasonable person.

The state appellate court recognized that the inclusion of "as a reasonable person" at the end of this instruction was erroneous.[4] *See In re Christian S.*, 7 Cal.4th at 771, 30 Cal.Rptr.2d 33, 872 P.2d 574. However, the court concluded that when all of the jury instructions on voluntary manslaughter were considered as a whole, "it [wa]s not reasonably likely that the jury would have misunderstood the requirements of the imperfect self-defense component of voluntary manslaughter." *People v. McNeil,* slip op. at 9. The state court's conclusion was objectively unreasonable and directly contrary to the trial record.

As the instruction reflects, the jury was instructed that imperfect self-defense required an actual belief in the need to defend against an imminent peril and that an imminent peril was peril that was apparent

---

**4.** California Jury Instruction—Criminal ("CALJIC") No. 5.17 is the model jury instruction on "Actual but unreasonable belief in necessity to defend—Manslaughter," and provides the same instruction as given by the judge in this case *but excludes* the last clause "or must so appear at the time to the slayer as a reasonable person." Indeed, by including a reasonableness requirement in the definition of imperfect self-defense, the court essentially re-stated the perfect self-defense instruction and removed any consideration of voluntary manslaughter premised on imperfect self-defense from the jury's consideration.

to a reasonable person, depriving McNeil of her due process right to present a complete defense. Indeed, by eliminating imperfect self-defense (and the corresponding voluntary manslaughter verdict) from the jury's consideration, the trial court also deprived McNeil of her due process right to meaningfully present her version of the facts. Under McNeil's version, even if the jury concluded that her perception of imminent peril was unreasonable, McNeil nonetheless had a genuine perception of imminent harm on the night that she shot Ray and was therefore, at most, guilty of voluntary manslaughter. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (describing the rights guaranteed under the due process clause, including, *inter alia*, the right to present a defense and the right "to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies"). Although a person who had not experienced the effects of long term battering might not have perceived the same imminent peril from the events confronting McNeil at the time of the killing, the BWS evidence provided an explanation of how a victim of the long term abuse may have an increased sensitivity to danger and peril and therefore could perceive a genuine threat of harm where another person might not.

The erroneous inclusion of a reasonable person standard in the definition of imminent peril eliminated one of McNeil's two possible defenses. Under the facts of this case, preventing the jury from considering McNeil's imperfect self-defense claim constituted a denial of her right to present a complete defense and her right to a fair trial. McNeil provided more than enough BWS evidence for a reasonable jury to conclude that she had a genuine perception of imminent harm, even if it concluded that that perception was unreasonable. *See Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. A parallel rule has been applied in the context of a lesser included offense instruction." (citations omitted)).

The trial court's failure to instruct the jury on the defendant's theory of defense violates the Due Process clause. In *Bradley v. Duncan*, we explained that under AEDPA the failure to instruct a jury on entrapment violated the defendant's due process right to present a full defense, explaining that under clearly established Supreme Court law, "the state court's failure to correctly instruct the jury on the defense may deprive the defendant of his due process right to present a defense. This is so because the right to present a defense would be empty if it did not entail the further right to an instruction that allowed the jury to consider the defense." 315 F.3d 1091, 1099 (9th Cir.2002) (citations omitted).

We reach this conclusion only after considering the charge to the jury as a whole. The only time that the trial judge actually defined imminent peril for the jury was in the erroneous instruction on imperfect self-defense instruction. Thus, during deliberations, the only definition of imminent peril available to the jury was one that imposed a reasonableness requirement.[5]

---

**5.** Although the court used the words "imminent harm" when explaining perfect self-defense, the court did not define the term "imminent harm." Notably, the court referred to "imminent harm" in the context of the perfect self-defense instruction, a context which required a reasonableness standard. That is, when explaining that in order for homicide to be justifiable and not unlawful, the court instructed that the person must "honestly and

McNeil's entire case focused on a claim that she had a genuine perception of imminent harm—she argued that she had a claim of reasonable self-defense or in the alternative a claim of unreasonable self-defense. Just as in *DePetris v. Kuykendall*, where the petitioner claimed imperfect self-defense,[6] McNeil's "sole defense was that she killed her husband in an honest belief that she needed to do so to save her life. The success of the defense depended almost entirely on the jury's believing petitioner's testimony about her state of mind at the time of the shooting." 239 F.3d at 1062.

The evidence presented here would support a perfect self-defense claim or an imperfect self-defense claim. For example, Dr. Kaser–Boyd opined that, as is common in women with BWS, McNeil was "hyper-vigilant" to danger and threats after Ray choked her the first time, "and that she responded almost automatically to her perception of danger." Thus, the erroneous definition of imminent peril likely prevented the jury from considering in a meaningful way how Battered Women's Syndrome would have affected McNeil's perception of imminent harm whereas a person who had not suffered years of abuse might not perceive imminent harm:

> The relevance to the defendant's actual perception lies in the opinion's explanation of how such a perception would reasonably follow from the defendant's

experience as a battered woman. This relates to the prosecutions's argument that such a perception of imminent danger makes no sense when the victim is asleep and a way of escape open and, therefore, she did not actually have that perception.

*People v. Aris*, 215 Cal.App.3d at 1197, 264 Cal.Rptr. 167; *see also Humphrey*, 13 Cal.4th at 1088–89, 56 Cal.Rptr.2d 142, 921 P.2d 1.

In sum, the instructional error here prevented McNeil from presenting a meaningful defense and had such a prejudicial effect on the verdict that it fits within the narrow category of errors that violate fundamental fairness. *McGuire*, 502 U.S. at 72, 112 S.Ct. 475. As the Supreme Court explained in *Albright v. Oliver*, the due process requirement is one of "safeguarding the liberty of the citizen against deprivation through the action of the State." 510 U.S. 266, 298, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Here, the jury was prevented from considering McNeil's theory of the defense that she had a genuine but unreasonable perception of imminent harm and if she was guilty of any offense it was voluntary manslaughter, not murder.

## B. The Application of AEDPA to the State Appellate Court's Decision

As explained above, under AEDPA, a federal court may grant a petition for writ of habeas corpus only if the state court

---

*reasonably* believe[ ] that the individual killed intended to commit a forcible and atrocious crime and that there was imminent danger of such crime being accomplished." The court's instruction further linked imminent harm to the concept of reasonableness when it further instructed: "[the] bare fear of death or great bodily harm is not sufficient to justify a homicide. To justify taking the life of another in self-defense, the circumstances must be such as to excite the fears of a *reasonable* person placed in a similar position ... The danger must be apparent, present, immediate and

instantly dealt with, or must so appear at the time to the slayer as a *reasonable* person ..." (emphasis added).

6. In *DePetris*, the petitioner presented BWS evidence and we held that the erroneous exclusion of evidence that supported the subjective aspect of claimed imperfect self-defense violated the petitioner's right to a fair trial; we therefore reversed the district court's denial of habeas relief. 239 F.3d 1057, 1059 (9th Cir.2001).

ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

■ Here, the state appellate court concluded that the erroneous instructions which, *inter alia,* eliminated imperfect self defense, were harmless and therefore did not address whether the errors interfered with McNeil's constitutional right to present a meaningful defense. It defies logic to point to the jury's second degree murder guilty verdict as evidence that the erroneous instructions preventing McNeil from presenting a defense were harmless. By preventing the jury from considering McNeil's critical claim of imperfect self-defense, McNeil was deprived of her right to "due process ... a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

To the extent that the state appellate court articulated its reasoning for concluding that any alleged instructional error was harmless, the court correctly identified the clearly established Supreme Court law that requires that instructional errors be considered in the context of the entire charge to the jury. *See Estelle,* 502 U.S. at 72, 112 S.Ct. 475. However, the state court unreasonably applied this constitutional principle. In rejecting McNeil's constitutional argument, the court selected several of the jury instructions from the charge to the jury on voluntary manslaughter, ignored other instructions, and looked to the jury's guilty verdict on second degree murder to conclude that the jury did not believe that McNeil had a perception (reasonable or unreasonable) of imminent peril. In violation of clearly es-tablished Supreme Court law, the state appellate court presumed that the jury ignored the clear (but erroneous) imperfect self-defense instruction.

When the state appellate court neglected to consider the ways in which the erroneous imperfect self-defense argument amounted to constitutional error, in effect presuming that the jurors simply ignored one of the instructions, its decision resulted in an unreasonable application of clearly established federal law as determined by the Supreme Court. "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp,* 414 U.S. at 146–47, 94 S.Ct. 396. The Supreme Court has held that it "presumes that jurors, conscious of the gravity of their task, attend closely [to] the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). We conclude that here, where the state court completely ignored unchallenged and uncorrected instructions to the jury, the state court's "application of clearly established law [was] objectively unreasonable." *Andrade,* 538 U.S. at ——, 123 S.Ct. at 1174.

■ Furthermore, the state court's reliance on the prosecutor's argument to support its conclusion that the verdict was not prejudiced by the erroneous instructions contradicts clearly established Supreme Court law. We have repeatedly recognized (and the Supreme court has long held) that instructions from a judge carry more weight than instructions from counsel, *see, e.g., Boyde,* 494 U.S. at 384, 110 S.Ct. 1190, and that jurors are presumed to follow the jury instructions they are given, *see Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176

(1987) (referring to "the almost invariable assumption of the law that jurors follow their instructions" (internal citation omitted)). In *Ho v. Carey*, 332 F.3d 587 (9th Cir.2003), we recently rejected the state court's conclusion that "the arguments of counsel clarified for the jury that it was required to convict Ho of manslaughter if it accepted his argument of self-defense" after the court had given an erroneous instruction on manslaughter. *Id.* at 594. Explaining that we "must presume that a jury follows the trial court's instructions," we stated that "[t]he arguments of counsel ... could not serve to remedy the court's erroneous ... instruction." *Id.* As the Supreme Court clearly explained in *Boyde,*

> [A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, ... and are likely viewed as the statements of advocates; the latter,[the Supreme Court has] often recognized, are viewed as definitive and binding statements of the law.

*Boyde,* 494 U.S. at 384, 110 S.Ct. 1190.

Thus, despite the prosecutor's argument that if the jury determined that McNeil actually believed in the necessity for self-defense she would be guilty of manslaughter and not murder, the jury, presumed to follow the instructions of the judge, likely applied the reasonableness requirement to its assessment of imminent peril and therefore could not find McNeil not guilty of murder unless it found her perception of peril to be a reasonable one. Under the facts of this case, McNeil's claim of imperfect self-defense was just as critical as her claim of perfect self-defense. The instructional error prevented the jury from considering this defense in a meaningful way—even if it did conclude that she genuinely perceived a threat of imminent harm, it could not find her guilty of voluntary manslaughter unless it believed that this perception was a reasonable one. The state court's erroneous decision with respect to imperfect self-defense was contrary to and involved an unreasonable application of clearly established Supreme Court law.

### IV. THE SUBSTANTIAL AND INJURIOUS EFFECT OF THE CONSTITUTIONAL ERROR

■ Next, we must determine whether the instructional error in the context of the charge to the jury as a whole "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (internal citation omitted). The powerful evidence presented in support of McNeil's claim that she had a real, if unreasonable, belief in imminent peril and the seemingly contradictory jury verdicts convince us that the error had a prejudicial effect on the jury's verdict. The error here thus surpasses the Supreme Court's threshold for finding prejudicial error; the Supreme Court has held that in the "special circumstance in which record review leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict," the writ should issue. *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). According to the Court, the "uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict." *Id.* Thus even if we were left in grave doubt as to the impact of this error on the jury's deliberation, we would conclude that McNeil is entitled to habeas relief under 28 U.S.C. § 2254. The import of the imperfect self-defense claim and its close relationship with the only other proffered defense, perfect self-defense, and the evidence presented in support of both claims, do not leave us in doubt as to the impact of this error on the jury's verdict.

In *Mancuso v. Olivarez*, we reiterated that "if one is left in grave doubt [about the harmfulness of the error], the conviction cannot stand." 292 F.3d 939, 950 (9th Cir.2002) (internal citation omitted). Just as in *Belmontes v. Woodford*, here, too, we need not decide who (if anyone) bears the burden of showing prejudice: "No matter who has the burden, or if there is no burden at all, we are convinced that the instructional error in this case, which prevented the jury from considering and giving effect to [McNeil's] most important[BWS] evidence, had a substantial and injurious effect on the jury's verdict." 335 F.3d 1024, 1070 (9th Cir.2003).

The BWS evidence focused on why McNeil, a woman who suffered the effects of BWS, would perceive a threat (reasonably or otherwise) under circumstances in which a person without BWS might not perceive a threat of imminent harm. In the absence of the instructional error, the jury would have been able to reach a verdict of manslaughter as opposed to murder if it accepted this evidence as it related to the genuine nature of McNeil's perception of imminent harm. Under the erroneous instruction, if the jury did not find such a perception reasonable, it could only convict her of murder.

The BWS evidence and testimony provided ample support for McNeil's imperfect self-defense defense. Dr. Kaser–Boyd, who conducted various interviews with McNeil, directly addressed the issue of the effect of BWS on McNeil's perception of fear: "People who have been battered tend to be afraid of other people, too. So if you have been beaten up and hurt by one person and someone gets aggressive with you physically, which is what she has described, it is not surprising that she should feel fear."

The BWS evidence detailing McNeil's history of abuse at the hands of Ray and her former husband, including the evidence of the impact of the earlier chokings and sexual assaults, as well as her belief that a woman she knew was killed by her husband when he choked her and broke her neck, provided sufficient evidence for a reasonable jury to accept McNeil's imperfect self-defense defense.

In sum, McNeil demonstrated that the instructional errors "had a substantial and injurious effect ... in determining the jury's verdict." *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710.

## V. CONCLUSION

The state appellate court's decision with respect to the instructional error in the imperfect self-defense instruction was contrary to the clearly established Supreme Court law that due process requires that a defendant have a fair opportunity to defend against the state's charges and that a defendant have a meaningful opportunity right to present a complete defense. *See Chambers,* 410 U.S. at 294, 93 S.Ct. 1038 and *Trombetta,* 467 U.S. at 485, 104 S.Ct. 2528. The state appellate court's assumption that the jury did not follow the trial court's charge to the jury contradicts clearly established Supreme Court law that presumes that jurors follow the instructions given to them by the court. *See Francis,* 471 U.S. at 324 n. 9, 105 S.Ct. 1965. The erroneous instruction on imperfect self-defense completely eliminated one of McNeil's principal theories of defense from the jury's consideration—the defense that she had a fear of imminent harm. Even if the jury believed that McNeil had an actual but unreasonable fear of imminent peril, the jury was precluded from finding her guilty of voluntary manslaughter.

The erroneous instruction had a substantial and injurious effect on the jury's verdict. McNeil was deprived of her con-

stitutional right to present a meaningful defense and thus her due process right to a fair trial as protected under the Fifth and Sixth Amendments. The state court's failure to consider the instructions as a whole resulted in an objectively unreasonable decision that failed to recognize the impact of this instructional error.

Accordingly, we reverse the district court's judgment and remand with instructions to grant the petition for writ of habeas corpus and to issue a writ containing conditions the district court finds to be appropriate.

REVERSED and REMANDED.